**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EVETTE W.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 18 C 6685** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§416(I), 423, 1381a, 1382c over eight years ago in July and August of 2014. (Administrative Record (R.) 227-235). She alternately claimed that she became disabled as of May 1, 2013, or May 21, 2014, due to dextroscoliosis of the spine, degenerative spine disease, osteoarthritis, and depression. (R. 227, 231, 273). Over the next four years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council.

Plaintiff filed suit under 42 U.S.C. § 405(g) on October 3, 2018, but this case had a bit of a bumpy ride once in federal court. There was an additional Complaint docketed eight months into the case, when the district court judge approved plaintiff's application to proceed *in forma pauperis*. [Dkt. ##21, 22]. The case was fully briefed as of July 1, 2019 [Dkt. ##14, 24, 25], but the district

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

court judge ordered the parties to file a status report by December 16, 2020. [Dkt. #31]. Neither side complied. The judge gave them a second chance to file a status report by March 29, 2021. [Dkt. #32]. Again, both sides seemingly just ignored the judge's Order, and this time, the judge dismissed the case for want of prosecution under Local Rule 41.1, as nothing had been filed since 2019. Judgment was entered on August 17, 2021. [Dkt. ## 34, 35]. The plaintiff filed a motion to vacate the judgment, arguing that the failure to follow the two court orders was "inadvertent, and reflected by [sic] general belief that the case was fully briefed as of July 1, 2019 and awaiting a decision." [Dkt. #36]. The judge granted the motion and reinstated the case on September 17, 2021. [Dkt. #39]. The judge asked for a couple of more status reports [Dkt. ##41, 42], and the parties then consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) almost three years into the case on March 31, 2022. [Dkt. #43]. It is the ALJ's 2017 decision (R. 25-44) that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

### A.

Plaintiff was born on July 16, 1969 (R. 227), making her almost 44 years old when she claims she became unable to work, and 48 years old at the time of the ALJ's decision. (R. 28-39). She has a GED and a nursing-assistant certification. (R. 274). The plaintiff has an excellent work record, working steadily for about 20 years through 2016. (R. 251-52). Most of that work was as as a personal nursing-assistant, working with patients undergoing rehabilitation in their homes or at facilities. (R. 275, 324-32).

The medical record is not lengthy, as these cases go. On August 5, 2014, plaintiff had a

psychiatry visit with Dr. Pawel Dudek. (R. 447). At the time, she was not seeing her former psychiatrist and had stopped taking her psychotropic medications for a year. (R. 447). She told the doctor she had been diagnosed with bipolar disorder and panic attacks back in 2007. (R. 447). That was the last time she had a panic attack. (R. 447). She never considered suicide and was never hospitalized due to her psychological impairments. (R. 447). Plaintiff had four adult children, two of whom still lived at home. Her fiancé was in prison for another two years. (R. 447). The doctor said plaintiff lacked facial emotions but appeared sad. (R. 447). She walked with a limp. (R. 447). Dr. Dudek put plaintiff on Lamictal and Trazodone. (R. 448).

On December 8, 2014, plaintiff had a consultative physical examination in connection with her application for benefits. (R. 451-454). Dr. Rochelle Hawkins noted plaintiff's history of bipolar disorder, depression, and degenerative joint disease on the back. She also noted plaintiff's report of her pain being 8/10. (R. 451). Strength was 5/5 in the upper extremities, grip strength was 5/5, and manipulation was normal. Range of motion and strength were normal in the lower extremities. Neurological exam was normal. (R. 453). There was no anatomical deformity of the spine and no limitation of motion. Gait was normal. Judgment and memory were intact, concentration was fair. Dr. Hawkins concluded that plaintiff was able to sit, stand, walk, lift, and carry without difficulty. (R. 454).

Plaintiff underwent a consultative psychiatric examination on December 12, 2014, with Dr. Ana Gil. (R. 462-466). Dr. Gil noted that plaintiff's affect was sad and restricted, and her mood appeared moderately depress. (R. 464). Plaintiff explained her fiancé was in prison and her daughter had been severely ill. (R. 464). Her thought process was logical, and memory was normal. (R. 464). Dr. Gil noted mild psychomotor agitation due to back pain. She diagnosed moderate bipolar

disorder. (R. 465).

On January 14, 2015, lumbar spine x-rays revealed rotary scoliosis, extensive facet joint degenerative disease, and an anomaly at L1-L2, with the vertebrae partially fused. (R. 494).

On March 12, 2014, plaintiff reported to her treating physician that she had been seeing a psychiatrist but was now stable without medication. (R. 421). Plaintiff had no physical complaints. (R. 421-22). Physical exam was normal throughout. (R. 422-23). On March 31, 2015, plaintiff saw Dr. Dudek and reported she was not sleeping due to noisy neighbors. She was irritable and "hurting all over." Dr. Dudek prescribed Risperidone at bedtime and increased the dosage of Lamictal. (R. 496).

In February, March and May of 2015, plaintiff had debridement treatment for keratoses of the feet, and her doctor discussed possible surgery. (R. 479, 482-84). X-rays of both feet on February 28, 2015, showed osteopenia, pes planus, arthritic changes, and small heel spurs. (R. 492).

On September 17, 2015, lumbar spine x-rays showed scoliosis to the right of at least 35 degrees. There was also a partial fusion abnormality at L1-L2, large disc space narrowing at L3-L4, and moderate facet degenerative changes and osteophyte formation. (R. 505).

On September 24, 2015, Plaintiff was seen in the emergency room for anxiety. R. 594. On June 8, she presented with stress and weakness, reporting that she did not want to go outside.

Plaintiff began a course of physical therapy on September 29, 2015. It was noted that she had a moderate loss of movement in terms of lumbar flexion and extension. (R. 515). In October, plaintiff reported her back pain as 5/10. (R. 523). She was having difficulty with hip strengthening exercises, but results were reduction of pain to 2/10. (R. 526). By November, plaintiff was improved in all areas, and reported no pain or radicular symptoms. She was discharged from her

course of physical therapy with all goals met and instructions to continue home exercises. (R. 562). The goals included ambulating around the community, reducing lumbar pain to just 2/10 after activities and performing the reciprocal stair pattern exercise one hour. (R. 553-54).

On October 20, 2015, plaintiff had a routine checkup with Dr. Badomesi. She said her lumbar pain was 6/10 and radiated down to her right nee. (R. 594). Dr. Badomesi noted tenderness to palpation along the spine, and positive straight leg rasing on the right. All other signs were normal. (R. 595). On November 17, 2015, plaintiff saw Dr. Badomesi for a checkup of her osteoarthritis in the knee and spine. Plaintiff reported that physical therapy had helped a great deal and her pain was minimal. She was taking tylenol when needed and staying away from heavy lifting. (R. 593). Range of motion was normal in all extremities. (R. 594).

Plaintiff was diagnosed with diabetes mellitus type 2 on March 2016. (R. 591). Physical exam was essentially normal other than that. There was no pedal edema, pulses were intact, range of motion was free. There were no neurological deficits. There were thick calluses on plaintiff's feet. (R. 591). On April 13, 2016, plaintiff complained of foot pain. (R. 589). Physical examination was normal. (R. 590). At a May 11, 2016 follow-up with Dr. Badomesi, plaintiff complained of left shoulder pain. (R. 588). The doctor reported neurological signs and range of motion as normal. (R. 588). On June 8, 2016, plaintiff reported feeling depressed. She also had numbness/tingling in her hands and feet. (R. 586). At a June 29, 2016 check-up, plaintiff had no complaints other than a sore throat. (R. 584). Physical exam, including neurological and musculoskeletal, was normal. (R. 585). On August 8, 2016, plaintiff complained of back pain off and on the previous week. It was 5/10, and radiated to her legs. (R. 583). Dr. Badomesi noted tenderness to palpation along the spine, but straight leg raising was negative and range of motion was

5

"free". (R. 584). Physical exam was normal in September of 2016. (R. 579-80). At a check-up on October 17, 2016, plaintiff complained of insomnia and diarrhea. (R. 578). Physical exam was normal. Dr. Bademosi made a referral for a sleep study and continued medications. (R. 579). On November 14, 2016, physical exam – including range of motion and neurological – was normal. (R. 577). On December 13, 2016, physical exam was again normal. (R. 576).

At a January 12, 2017 checkup, plaintiff had no complaints. (R. 573). Neurological exam was normal, as was range of motion in all extremities. (R. 574). On February 16, 2017, physical exam results were normal, including neurological and musculoskeletal; range of motion was "free." (R. 571). On May 16, 2017, plaintiff had a follow-up exam after her hysterectomy. (R. 569). Physical exam revealed bilateral pedal edema, but was normal in all other facets. (R. 570). On May 25, 2017, plaintiff was complaining of pain subsequent to varicose vein surgery. (R. 566). Physical exam was normal, including range of motion, with the exception of some right pedal edema. (R. 567).

On May 22, 2017, licensed clinical social worker Sheila Hassan reported that she had been seeing plaintiff off and on since August of 2015. She assessed a GAF score of 49. (R. 563). Ms. Hassan said plaintiff had mildly impaired memory and experienced weekly panic attacks. She had issues with problem solving, motivation, and decision-making. Mood was sad, affect was appropriate, thoughts were organized, and concentration was "mod low." (R. 565).

## B.

After an administrative hearing at which plaintiff– represented by counsel – and a vocational expert testified, the ALJ determined the plaintiff had the following severe impairments: obesity, lumbar degenerative disc disease and degenerative joint disease with scoliosis; degenerative joint

disease, osteopenia, pes planus and small heel spurs in both feet; bipolar disorder and history of a

learning disorder. (R. 31). The ALJ then found plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix

1, focusing on the listings for mental disorders (12.04, 12.11) and musculoskeletal disorders (1.02,

1.04). (R. 32-33).

      The ALJ then determined that plaintiff could perform sedentary work with the following

additional limitations:

> occasionally stoop, kneel, crawl and climb stairs; never climb ladders, ropes or
> scaffolds, and never perform work tasks involving extraordinary hazards such as
> unprotected heights and unguarded moving mechanical parts that can engage the
> body; can understand, remember, carry out and adapt to the demands of simple
> routine tasks and make simple work related decisions on a sustained basis; can never
> perform fast paced production line tasks that are timed, only goal oriented work
> tasks.

(R. 33). The ALJ then summarized the plaintiff's allegations. She noted that plaintiff alleged she

can stand for no more than 5-10 minutes and lift only 5-10 pounds, and that she uses a cane at home.

She further noted that plaintiff claimed she had a depressed mood, little interest in activities, anxiety,

panic attacks, and difficulties with concentration. (R. 34). The ALJ then determined that the

plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and other evidence

in the record for the reasons explained in this decision." (R. 34). The ALJ then stated that the

plaintiff's activities – including working two days a week for four hours a day doing some

housekeeping for a senior client, shopping, preparing meals, doing laundry, and using public transit

7

– were not consistent with her allegations. (R. 35). The ALJ then discussed the medical record, conceding that there were significant radiological findings, including 35 degree scoliosis, extensive facet joint disease, anomalies at L1 and L2, an numerous issues in both feet and heels. (R. 35). But the ALJ also noted a number of essentially normal physical exams with free extremity range of motion and no neuromuscular deficits. (R. 35-36). The ALJ further noted that treatment was conservative, with no recommendations for pain management, injections, or surgery. (R. 36). As for plaintiff's psychological impairments, the ALJ said there were limited objective findings and that plaintiff was stable on medication. (R. 36).

As for medical opinions, the ALJ noted the state agency reviewing physicians found plaintiff could perform medium work, but gave them limited weight because the evidence supported more significant physical limitations. (R. 37). The ALJ gave considerable weight to the first reviewing psychologist who found plaintiff could perform simple and detailed tasks with mild complexity. The ALJ rejected the opinion from the reconsideration psychologist who found plaintiff limited to 1-3 step tasks because mental status exams resulted in generally minimal findings. (R. 37).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could no longer perform his past heavy and medium work, but could perform jobs that existed in significant numbers in the national economy, such as: address clerk (DOT #209.587-010, 66,700 jobs); document preparer (DOT 249.587-018, 32,500 jobs); or call out operator (DOT#237.367-014, 50,800 jobs). (R. 38). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 39).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill,* – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, at least thus far, the ALJ also has an obligation to build what the court has called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court

agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."[2] *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record..."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. But no matter what one's view of the "logical bridge"

---

[2] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in a non-Social Security context in *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167. Judge Posner, first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) and would be the first to acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

More recently, the Seventh Circuit, in a Social Security case explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

requirement, no one suggests that the "accurate and logical bridge" must be the equivalent of the Point Neuf. The subjectivity of the requirement makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit.

But, at the same time, the Seventh Circuit has also called the "logical bridge" requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Indeed, prior to *Sarchet*, the Seventh Circuit "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence . . . in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Later, in *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985), the court was more explicit when rejecting a plaintiff's argument that an ALJ failed to discuss his complaints of pain:

> We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. . . . This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

11

*Id.*, at 287 (citations omitted). Or, as the court succinctly put it, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id*. at 287-88. The ALJ has done enough here.

### III.

The plaintiff has a number of issues with the ALJ's decision. Her brief wedges them all into the categories of: the ALJ failing to provide a detailed assessment of plaintiff's mental functioning for purposes of the RFC assessment; the ALJ premising her assessment of plaintiff's subjective symptomatology upon illogical and impermissible inferences; and the ALJ failing to conduct a proper assessment of all opinion evidence in the record. The plaintiff's many sub-arguments tend to meander in and out of these categories, making it a little difficult to address each of the critiques the plaintiff has of th ALJ's opinion. There is a fair amount of nit-picking – which the court cannot join the plaintiff in, *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) – a little bit of misreading of the opinion, and some selective reading of the medical record.

Briefs like this can be a challenge, because what the court needs most from the parties is direction to the medical evidence in the record that supports their arguments and an explanation of how it does. There is only a little of that here, however, and more of what the Seventh Circuit has called "the equivalent of a laser light show of claims . . . so distracting as to disturb our vision and confound our analysis." *United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011). But after a review of the record and the ALJ's decision – with plaintiff's many contentions in mind – it must be concluded that the ALJ's decision must be affirmed as supported by substantial evidence.

12

**A.**

The plaintiff's first problem with the ALJ is actually an error plaintiff's counsel committed. According to plaintiff's counsel, plaintiff began seeing psychiatrist, Dr. Brooks Wilkenson, until he retired in April 2017. [Dkt. #14, at 3]. Counsel asserts that he tried to get treatment records from Dr. Wilkenson but was unable to do so. Counsel then requested that the ALJ subpoena those records, but the ALJ denied that request. [Dkt. #14, at 3]. We review an ALJ's denial of a subpoena request for an abuse of discretion. *Krell v. Saul*, 931 F.3d 582, 586 (7th Cir. 2019). That's a "highly deferential" standard. *Vega v. Chicago Park Dist.*, 12 F.4th 696, 706 (7th Cir. 2021). "Abuse of discretion means a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor." *In re Veluchamy*, 879 F.3d 808, 823 (7th Cir. 2018). There was no abuse of discretion here.

At the time of the plaintiff's administrative hearing, parties who wished to subpoena records had to file a written request for the issuance of a subpoena with the administrative law judge or at a Social Security office at least 5 business days before the hearing date. 20 C.F.R. § 404.950(d)(2) If they miss the deadline, they have to show "[s]ome . . . unusual, unexpected, or unavoidable circumstance beyond [their] control prevented you from informing us about or submitting the evidence earlier." 20 C.F.R. § 404.935(b). Examples include serious illness, serious illness or death in the immediate family, records having been damaged by fire, and "actively and diligently s[eeking] evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing." 20 C.F.R. § 404.935(b)(3).

Counsel missed the deadline here. He explains that he requested the records from Dr. Wilkenson two months, and one month, prior to the administrative hearing. He then claims that,

when the records were not forthcoming, "[o]n June 5, 2017, two weeks prior to the hearing, [he] had submitted a request for subpoena, seeking assistance from the ALJ to obtain the records." [Dkt. #14, at 7]. But that is not what occurred.

At the hearing, plaintiff's counsel indicated that the record was incomplete and then told the ALJ he had sent the ALJ a letter requesting a subpoena. But, the ALJ pointed out that counsel had actually submitted an Appointment of Representative document in that filing. Counsel then had to concede and explain:

> . . . yeah, that letter is not in there, judge. It was a letter that we meant to send in on June 5, and instead, we sent in an appointment of rep. I know that putting two-and-two together, because I asked my paralegal for a copy of the letter, and she sent me exactly what was sent in, which was not the letter. I now have the letter in hand.

(R. 49-50). It's unclear why counsel first claimed to the ALJ that he sent the letter when he knew he hadn't. It's also unclear why counsel asserts in his brief that he "had submitted a request for subpoena, seeking assistance from the ALJ to obtain the records", when he knew he had not. But, those questions aside, counsel made a clerical error, or in any event, an error he blamed on his paralegal, for whose conduct he is, of course, responsible. He does not explain how such an error falls in the category of "unusual" like death or serious illness, or how it was "unavoidable." The mistake he made was avoidable and, in general, mistakes are not unusual. Indeed, this case was dismissed by the district court judge due to two other "inadvertent" mistakes counsel and the Commissioner's attorney made when they ignored two court Orders requiring status reports. Counsel also says he was diligent in requesting the evidence in April 2017 and May 2017. But, on the other hand, counsel had already been plaintiff's attorney for eight months before that, since August of 2016. (R. 183). So, with those being the facts before the ALJ, it can't be said that there

was an abuse of discretion.

Finally, in order to get a subpoena, the party has to "state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena."  20 C.F.R. 404.950(d)(2).  Counsel didn't do that before the ALJ, and hasn't done it here.  Instead, plaintiff explained that Dr. Wilkenson would just refill her medications every three months.  He didn't speak with her much, and sessions didn't even last fifteen minutes.  (R. 63).  That doesn't sound like evidence that is going to bring much of anything important to the table.  Given all this, again, it cannot be said that the ALJ abused her discretion.

**B.**

Plaintiff next argues that the ALJ failed to present a detailed assessment of Plaintiff's mental functioning for purposes of the RFC assessment.  But there simply is not much evidence regarding plaintiff's mental health or its effect on her ability to work.  At Step 3, the ALJ relied on the reviews of the medical evidence by the state agency psychologist and psychiatrist.  In accepting their opinions at Step 3, the ALJ noted that the record was one of conservative treatment, and that the limited clinical findings did not support any further limitations.  The ALJ also considered plaintiff's daily activities and noted that she lived alone and was able to keep up with her housework and self-care, shop in stores, make simple meals, and take public transportation.  The ALJ further noted that plaintiff said she got along with others, and that the only problem she had in that respect was with an individual client while working as a CNA.  (R. 33).

The ALJ reiterated those observations in her summary of the medical record.  She also pointed out that plaintiff was able to work two days a week, four hours a day, taking care of a senior client.  (R.35).  The ALJ also noted that plaintiff had essentially normal mental status exams.  She

managed her symptoms with medication and conservative treatment. She had sporadic therapy sessions. (R. 37).

It's not clear what more the ALJ might have done to satisfy the plaintiff. Again, there was not a lot of evidence regarding psychological impairments in the medical record. It is the plaintiff's burden to prove she is disabled and to do so with medical evidence. *Kaplarevic v. Saul*, 3 F.4th 940, 943 (7th Cir. 2021); *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021)(the plaintiff "bears the burden to prove she is disabled by producing medical evidence."); *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021)(plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled). Plaintiff argues that, because she has been diagnosed with depression, bipolar disorder and panic disorder, she is therefore unable to understand, remember, carry out, and adapt to the demands of simple, routine tasks and make simple work related decisions on a sustained basis, and perform, on a sustained basis, goal-oriented tasks. [Dkt. #14, at 9-10]. But, diagnosis is not disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). What matters is the severity of the condition and how it limits plaintiff's capacity to work based on clinical and/or laboratory findings. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("... it makes no difference if [plaintiff] saw [his doctor] "every two-and-a-half months" ... what does matter is that [his doctor] did not confirm the severity of [plaintiff's impairment] with medical examinations or tests."); *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case is not the existence of these various conditions of hers but their severity...."). Beyond these diagnoses, plaintiff points to no more than a handful of pages from the 236-page medical record (R. 399-635): three instances where she sought treatment or had a mental health complaint – in September 2015, June 2016, and October 2016 – and a report from plaintiff's social

16

worker/counselor. [Dkt. #14, at 10]. That is not enough to show that the ALJ's decision is not based on "substantial evidence" in the record.

Those first three pieces of evidence are not really medical evidence that proves – or helps to prove – that plaintiff cannot work. For example, in September 2015, plaintiff told Dr. Badomesi that she went to the ER at South Shore Hospital for anxiety. (R. 594). Plaintiff has not provided the record from that visit, and there is nothing to indicate what was determined regarding her mental health at that particular time. The other two pieces of evidence are no more than plaintiff's own reports of symptoms she said she was experiencing at that particular time. On June 8, 2016, plaintiff reported feeling stressed and weak and not wanting to go outside; her antidepressant medication helped. (R. 586). On October 17, 2016, she reported having insomnia for the previous three months. (R. 578). There were no *medical* findings from these visits that in any way addressed her allegations. And, as already suggested, a plaintiff's subjective complaints "taken alone, are not conclusive of a disability,"*Zoch*, 981 F.3d at 601; 42 U.S.C. § 423(d)(5)(A); *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022)("The Social Security Act requires that an individual "furnish[ ] such medical and other evidence" of a disability in order to qualify for benefits.").

Similarly, the report from plaintiff's social worker was more a recitation of plaintiff's complaints that an opinion from a health care worker. Essentially, Ms. Hassan simply echoes plaintiff's reports to her from their sessions. She assigned plaintiff a GAF score[3] of 49 which should indicate serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting)

---

[3] A GAF score is a "snapshot" of functioning and is not determinative of disability, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Indeed, the American Psychiatric Association abandoned the GAF scale as long ago as 2013 because of its "conceptual lack of clarity ... and questionable psychometrics in routine practice." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014).

OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994); *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014). Yet, as the ALJ pointed out (R. 36), there is nothing in the record that suggests anything so dire.[4] Ms. Hassan provides treatment notes from her sessions to support her assessment. An ALJ may properly reject an opinion, even from a treating psychiatrist, that is inconsistent with the record, *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022); *Zoch*, 981 F.3d at 602, and/or unsupported by clinical findings. *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

On the other hand, the plaintiff just generally faults the ALJ for relying on the medical experts who reviewed the medical record [Dkt. #14, at 8-9] and found plaintiff able to perform simple, routine work, and complete a normal workday. (R. 111, 124). But the ALJ accepted those opinions because they were consistent with the medical evidence; nothing in the medical record undermined those opinions to any degree. And, the ALJ considered plaintiff's activities – including plaintiff's part-time work caring for a senior client – as further support for the state agency reviewers' opinions. Accordingly, it was entirely proper for the ALJ to rely on those opinions. *See Gedatus*, 994 F.3d at 899 ("The ALJ gave solid, substantiated reasons for giving more weight to the state-agency physicians' opinions than to [plaintiff's] claims about the limiting nature of her symptoms.");*Matthews v. Saul*, 833 F. App'x 432, 433 (7th Cir. 2020)(opinions of the agency doctors constitute substantial evidence to supports an ALJ's conclusion); *Murphy v. Astrue*, 454 F. App'x

---

[4] Plaintiff briefly charges the ALJ with failing to address the opinion from plaintiff's social worker at all. [Dkt. #14, at 14]. That's obviously not true.

514, 519 (7th Cir. 2012); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

## C.

Plaintiff then contends that the ALJ's assessment of her subjective symptoms was premised upon "illogical and impermissible inferences." [Dkt. #14, at 11].  There is no presumption of truthfulness for a claimant's subjective complaints. *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009).  An ALJ's credibility finding must be upheld unless it is "patently wrong" and the ALJ failed to provide reasons for his assessment. *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). The ALJ did just that here.

Plaintiff first claims the ALJ rejected her allegations because the ALJ didn't like her character, citing SSR 16-3p [Dkt. #14, at 11]. But this just seems to be an unsupported attack on the ALJ because the plaintiff provides no evidence from the record to support this claim.  Indeed, the ALJ specifically considered plaintiff's daily activities, the objective medical evidence, and conservative course of treatment.  (R. 35-36).  Any one of these factors are valid reasons for finding a plaintiff's allegations less than credible.  20 C.F.R. § 416.929(c); *Deborah M.*, 994 F.3d at 790-91 (ALJ may properly consider objective medical evidence, course of treatment, and daily activities); *Gladney v. Saul*, No. 857 Fed.Appx. 235, 239 (7th Cir. Apr. 23, 2021)("To determine the credibility of allegations of disabling symptoms, an ALJ may consider several factors, including objective medical evidence, daily activities, and any inconsistencies between the allegations and the record."); *Zoch*, 981 F.3d at 601(same).

But, plaintiff accuses the ALJ of equating plaintiff's daily activities with full-time work without sufficient explanation. [Dkt. #14, at 11].  It's true that the Seventh Circuit has repeatedly

cautioned ALJs not to equate household chores and errands with the rigorous demands of the workplace. *See, e.g., Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Spiva v. Astrue,* 628 F.3d 346, 352 (7th Cir. 2010). But plaintiff has misread the ALJ's opinion. The ALJ specifically said that plaintiff's activities were inconsistent with the rather extreme limitations she claimed she had, not that they were consistent with work. (R. 35). It cannot be said that the ALJ was patently wrong. *See Deborah M.*, 994 F.3d at 789; *Summers*, 864 F.3d at 528; *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). Doing household chores and caring for a senior client twice a week for four hours, taking care of her own housework, shopping, taking public transit, all exceed plaintiff's claim, for example, that she can only stand for 5 or 10 minutes at a time.

Plaintiff then finds fault with the ALJ's comparison of her allegations with the objective medical evidence. [Dkt. #14, at 11-12]. Although an ALJ may not simply disregard a claimant's subjective complaints of pain, she may view discrepancies with the medical record as probative of exaggeration. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir.2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005). Here, the ALJ noted the objective studies that supported the existence of a severe back impairment, but again, the question is what limitations result from those impairments. The plaintiff's brief offers no clue. *See, e.g, Gedatus*, 994 F.3d at 905 (plaintiff "has not pointed to any medical opinion or evidence to show [his impairments] . . . caused any specific limitations."); *Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021)("[P]laintiff] does not point to any objective evidence or medical opinions in the record that support stricter limitations. She also does not say what stricter limitations she requires."); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)(" It is unclear what kinds of work restrictions might address [plaintiff's] limitations . . . [s]he

hypothesizes none."). As the ALJ pointed out, exam after exam resulted in normal findings. (R. 35). Plaintiff ignores these reports – months of them, mostly from her treating doctor, Dr. Badomesi – which is ironic, as plaintiff more than once accuses the ALJ of "cherry-picking." [Dkt. #14, at 12, 14]. These normal examination results, which make up much of the medical record, certainly amount to substantial evidence to support the ALJ's rejection of plaintiff's allegations.

The ALJ also considered plaintiff's course of treatment, noting it was conservative, and that physical therapy had been successful in significantly reducing her pain. (R. 36). The plaintiff has issues with the ALJ doing this, as well. But obviously an ALJ can take note of a record that shows that physical treatment was limited to physical therapy and medication, and that psychiatric treatment was limited to medication and some therapy sessions. *See, e.g., Deborah M.*, 994 F.3d at 789; *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)(affirming an adverse credibility finding based on the claimant's "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session."); *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (characterizing epidural injections as conservative treatment). Moreover, the record shows that physical therapy was successful. (R. 563, 592). Plaintiff belittles the fact that the course of treatment resulted in "all goals [being] met," but that completely ignores what those goals were: walking around the community, negotiating stairs for extended periods, and performing daily activities with almost no pain. (R. 553-54). So, it's a bit of a stretch to liken this case to one where the plaintiff suffered a stroke and had "improved" only to a point where she still did not know where her right had was. [Dkt. # 14, at 13, citing *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014)].

In the end, there is nothing the ALJ overlooked or disregarded. *See Taylor v. Kijakazi*, No. 21-1458, 2021 WL 6101618, at *2 (7th Cir. Dec. 22, 2021)("We have identified no material

evidence overlooked or otherwise disregarded. And we see nothing compelling a finding that [plaintiff] requires greater functional limitations than those determined by the ALJ."); *Stephens*, 766 F.2d at 287-88. While there is certainly evidence to support the existence of severe impairments, there is also much evidence of normal exam findings, few complaints, and conservative treatment. And plaintiff has not pointed to any medical opinion or evidence to show [her impairments] caused any specific limitations." *Gedatus*, 994 F.3d at 905. As already noted, the ALJ's decision need not be supported by a preponderance of the evidence, only *substantial evidence*; "more than a mere scintilla." *Addis v. Dep't of Lab.*, 575 F.3d 688, 690 (7th Cir. 2009); *Cohen v. Astrue*, 258 F. App'x 20, 26 (7th Cir. 2007); *Schmidt*, 496 F.3d at 842; *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). That is the case here.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for reversal [Dkt. #13] is denied, and the defendant's motion for affirmance [Dkt.# 23] is granted.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/8/22